# Illinois Official Reports

## Appellate Court

---

### *People v. Matute*, 2020 IL App (2d) 170786

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWIN L. MATUTE, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-17-0786 |
| Filed | February 27, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 14-CF-2018; the Hon. James K. Booras, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part.<br>Cause remanded with directions. |
| Counsel on Appeal | James E. Chadd and Thomas A. Lilien, of State Appellate Defender's Office, of Elgin (Richard Dvorak, of Dvorak Law Offices, LLC, of Willowbrook, of counsel), for appellant.<br><br>Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

Panel            JUSTICE BURKE delivered the judgment of the court, with opinion. Presiding Justice Birkett and Justice Schostok concurred in the judgment and opinion.

## OPINION

¶ 1       Following a bench trial, defendant, Edwin L. Matute, was found guilty of three counts of predatory criminal sexual assault of a child, J.M., and sentenced to 27 years' imprisonment. On appeal, defendant contends that (1) the trial court improperly denied his amended motion to suppress statements, (2) the State failed to prove him guilty of predatory criminal sexual assault beyond a reasonable doubt, and (3) the trial court committed plain error by relying on defendant's lack of remorse in sentencing him to 27 years in prison. We affirm the convictions, vacate the sentence, and remand for resentencing.

¶ 2       I. FACTS

¶ 3       J.M.'s mother, L.M., contacted the police after discovering that defendant had been having sexual intercourse with J.M. L.M. reported that the sexual assaults occurred in her apartment. J.M. was 11 years old at the time of the offenses. Defendant is L.M.'s cousin.

¶ 4       A. Motion to Suppress Statements

¶ 5       Before the trial, defendant filed an amended motion to suppress statements, alleging that he "did not have a full understanding of his *Miranda* rights" prior to making statements to the police. See *Miranda v. Arizona*, 384 U.S. 436 (1966). The following evidence was presented at the hearing on the motion.

¶ 6       Detective Andy Ulloa testified that on July 23, 2014, he and Detective Tim Ives went to defendant's place of employment. They asked defendant to accompany them to the police station, but they did not tell him what the investigation was about. Defendant agreed to come. On the way, defendant was not handcuffed and was seated in the rear, passenger side of the unmarked vehicle. Ulloa did not threaten defendant, place his hands on defendant, or tell him what he needed to say. Ulloa, who was fluent in Spanish, made small talk with defendant, who did not speak English, but they did not talk about the case.

¶ 7       At the station, defendant was placed in an interview room equipped with audio and video recording equipment, which was activated. Before the interview, Ulloa informed defendant of his *Miranda* rights by reading them off a form written in Spanish. The form contains defendant's name, date of birth (April 20, 1990), address, and the date and time of the interview. The form also contains a series of statements, which are numbered one through four. Ulloa crossed off each number with a diagonal line after he had read each statement to defendant. After reading the *Miranda* warnings, Ulloa did not ask defendant to sign the form.

¶ 8       The videotape of the interview was played for the court. The State introduced Exhibit 3, which is the Spanish *Miranda* rights waiver form that Ulloa stated that he had read to defendant. The State also introduced Exhibit 4, which is a consent form to search defendant's cell phone.

¶ 9 Ulloa stated that the entire interview was conducted in Spanish and that, as part of the investigation, an English translation of the transcript was drafted. Ulloa reviewed the videotape, which was entered into evidence. Ulloa also reviewed the English translation of the transcript, which also was introduced into evidence, and testified that it was a true and accurate copy. The transcript revealed the following colloquy:

"ULLOA: I'm going to explain to you why you're here, but I'm going to read this first. I always read this page with any person that I speak with. I'm going to explain to you everything we're going to do. Okay?

DEFENDANT: Uh-huh.

ULLOA: You have the right to remain silent. Do you understand?

DEFENDANT: Uh-huh.

ULLOA: Do you understand?

DEFENDANT: Yes.

ULLOA: Okay. Anything you say can be used against you in a court of law. Do you understand? You have the right to talk with an attorney before answering any questions or making a statement while we're asking you questions, if you so desire. Do you understand?

DEFENDANT: Uh-huh.

ULLOA: Okay. If you don't have money for an attorney, one will be appointed for you before we ask any questions, or at any time that we're asking questions, if you so desire. Do you understand?

DEFENDANT: Yes, I understand."

¶ 10 Through an interpreter, defendant testified that he had lived in Honduras for 24 years before coming to the United Sates, on January 20, 2014. He had never been arrested and had no contact with the court systems in the United States or in Honduras. Defendant stated that the detectives handcuffed him before he was transported to the police department. Ulloa told defendant that if he cooperated, Ulloa would "help" him, although the detective did not tell him how he would help him. Defendant stated that he was never given the opportunity to read the Spanish *Miranda* waiver form before the questioning. He stated that he was not shown the form and signed only the form permitting the police to take his cell phone. Defendant stated that he did not understand when Ulloa read him his rights, that he did not understand the words, and that he said "yes" only because he was nervous.

¶ 11 On cross-examination, defendant stated that he had attended college for two years but did not graduate. He studied for a career in business administration and could read and write. He did not specify the language in which he could read and write. At one point, defendant stated that in Honduras he had lived with his cousin, who was a police officer. Defendant also conceded that the videotape of the interview accurately depicted his conversation with Ulloa.

¶ 12 The trial court denied the motion to suppress, concluding that Ulloa was credible, and that defendant's testimony was "lacking in veracity." The court found that defendant's behavior, appearance, and engagement with Ulloa demonstrated that he understood that he was waiving his rights.

¶ 14        J.M. testified at trial that she was 14 years old. On July 20, 2014, she was 11 years old and was living with L.M. in a one-bedroom apartment. She identified defendant and stated that on July 20, 2014, he was over 18 years old. On that date, J.M. let defendant into the apartment, and they had sexual intercourse while her mother was at Walgreens picking up medication. This occurred on one of the two beds in the bedroom, which J.M. shared with her mother. J.M. did not remember if defendant had used a condom, but she later clarified that defendant had always used a condom during intercourse and that he would flush it down the bathroom toilet.

¶ 15        Defendant left the apartment shortly after, and while he was walking down the stairs from the second-floor apartment, defendant encountered L.M. Defendant explained to L.M. that her boyfriend had asked him to pick up L.M. from the apartment. L.M. proceeded to enter the apartment and soon afterward discovered a used condom floating in the bathroom toilet.

¶ 16        L.M. took J.M. to Lurie Children's Hospital (Lurie) the following day, where J.M. gave the following handwritten statement: "My cousin put his private part on mine yesterday."

¶ 17        J.M. stated that this was not the first time that she and defendant had sexual intercourse. She described what sexual intercourse meant: "His penis went inside of my vagina." J.M. stated that she had sexual intercourse with defendant about "four or five" other times and that it always took place in the apartment. She recalled that, the first time it happened, defendant placed his penis inside her vagina while they were on a bed in the living room. The next incident took place in the bedroom, on her mother's bed, which made her feel guilty. Another occurrence took place in the living room on her bed, which had been moved to the living room from the bedroom. During this incident, defendant placed his penis in her mouth and her vagina. J.M. continued that she did not want to have sexual intercourse with defendant but that he said that she must, to show him that she loved and cared for him.

¶ 18        During cross-examination, J.M. testified that she used to sleep in the bedroom with her mother, each in their own bed. J.M.'s bed had been moved into the living room when defendant moved into the apartment in the summer of 2014. J.M. slept with her mother while defendant used her bed in the living room. J.M. thought that defendant lived with them for about one month. She did not remember telling her mother that the condom floating in the toilet had been used on only a vibrator. Nor could she remember if she told her mother that she had sexual intercourse with defendant on only two prior occasions. J.M. did remember that she did not tell her mother, a social worker, or anyone at the hospital about having oral sex with defendant.

¶ 19        L.M. identified defendant as her cousin and stated that he had lived in her apartment for about 15 days. On July 20, 2014, she left the apartment to give her boyfriend a ride to a bar. She parked the car behind the apartment because she wanted to "spy." As she headed up the stairs, she encountered defendant while he was walking down the stairs. L.M. questioned defendant about why he was at the apartment. L.M. then entered the apartment, followed by defendant. She asked defendant to explain what was happening. Defendant told L.M. that "nothing happened" and that he loved L.M. "so much." L.M. went to use the toilet, and she discovered a condom floating inside the toilet bowl. She collected it and placed it in a bag. Later that night, L.M. asked J.M. about the incident, and after denying that anything inappropriate took place between her and defendant, J.M. confessed that she had engaged in "relationships" with defendant. L.M. took J.M. to the police department the following day, and the police sent them to the hospital so J.M. could get a sexual-assault examination.

¶ 20    On cross-examination, L.M. stated that she became suspicious of defendant because she had previously discovered in the apartment a wrapper from a condom, which J.M. claimed that she did not use. Also, on the night of the July 20, 2014, incident, J.M. told L.M. that she previously had sex with defendant "around two or three times."

¶ 21    Following L.M.'s testimony, the parties stipulated to, *inter alia*, the testimony of nurses and a social worker at Lurie; the testimony of Lynn Aladeen, the forensic interviewer at the Lake County Children's Advocacy Center; and the videotape and the transcript translated from Spanish to English of the statements defendant made during his interview with Ulloa.

¶ 22    Defendant told Ulloa that he was having sexual relations with J.M. at her apartment. He remembered having sexual relations with her only three times and said that he always used a condom. Defendant said that the first time was in April 2014. He explained that they "got nude" and he penetrated her vagina with his penis.

¶ 23    Christine Weathers, a forensic scientist, conducted a DNA analysis on J.M.'s blood standard, which was used to create a DNA profile for J.M. She also swabbed the condom that was taken from the toilet bowl. Semen was identified on the swab taken from the exterior surface of the condom (Stain A) and the swab taken from the interior surface of the condom (Stain B). Weathers also conducted a biological examination of defendant's saliva taken from the inside of his cheek.

¶ 24    Kenneth Pfoser, a forensic DNA consultant, conducted a DNA analysis on Stains A and B. Pfoser conducted a differential extraction on Stain A, which allowed him to look at the spermatozoa and the nonspermatozoa parts of the stain. Pfoser concluded that the DNA profile obtained from the nonspermatozoa fraction of Stain A matched J.M.'s DNA profile. The spermatozoa fraction of Stain A was consistent with DNA coming from "one unknown male individual." A differential extraction on Stain B allowed Pfoser to examine the spermatozoa and nonspermatozoa parts of the stains. He determined that the DNA profile obtained from the nonspermatozoa fraction of Stain B was also consistent with DNA coming from "one unknown male individual." As to the spermatozoa fraction of Stain B, there was insufficient DNA to conduct a DNA comparison. Nevertheless, Pfoser determined, the samples from both Stains A and B were "consistent with coming from the same contributor."

¶ 25    Sara Owen, a forensic biologist and DNA analyst, conducted an analysis on the saliva standard taken from defendant. She determined that the "profile obtained from the known standard of [defendant] could not be excluded as the contributor of the DNA profile obtained from the spermatozoa fraction" of Stain A and the nonspermatozoa fraction of Stain B. She testified that the profile could not be excluded but was not a match because she obtained complete information at only 14 out of 15 locations. She could compare the 14 locations of complete information to the known standard of defendant and those 14 locations were an exact match but, because it was not 15 out of 15, "we say cannot be excluded."

¶ 26    Defendant moved for a directed finding after the State rested, which the trial court denied.

¶ 27    The parties stipulated to the following defense witnesses' testimony in defendant's case-in-chief. Brock Franklin, a medical doctor employed with the Vista East Medical Center in Waukegan, would testify that on July 21, 2014, he spoke with L.M. at the medical center and she told him that J.M. told her that defendant sexually assaulted J.M. two times.

¶ 28    Sheila Hickey, a licensed clinical social worker employed by Lurie, would testify that, on July 21, 2014, she spoke with L.M. at the hospital, and L.M. told her that J.M. had disclosed to L.M. that she and defendant had sexual intercourse on July 20, 2014, and one other time.

¶ 29    Lisa Mathey, a sexual assault nurse examiner employed by Lurie, would testify that on July 21, 2014, L.M. told her that J.M. had disclosed to L.M. that she and defendant had sexual intercourse two times.

¶ 30             C. Trial Court's Ruling, Motion for a New Trial, and Sentencing Hearing

¶ 31    Defendant was tried on five counts of predatory criminal sexual assault of a child between April 1, 2014, and July 20, 2014, in five separate and distinct acts. The trial court found defendant guilty of counts I, II, and III, but not guilty of counts IV and V. Defendant's subsequent motion for a new trial was denied.

¶ 32    In sentencing defendant to an aggregate of 27 years' imprisonment (9 years on each count, to be served consecutively), the court found that it was "a little bit disturbing that the defendant has not offered any allocution whatsoever and even changed the story when he came to statements made to the probation officer[,] which varies significant[ly] from the video confession that this defendant has given."

¶ 33    The trial court denied defendant's posttrial motion to reconsider the sentence. The court found the sentence to be appropriate, and it stated: "I also considered heavily the defendant's lack of remorse and the defendant's now recent denial."

¶ 34    Defendant timely appeals.

¶ 35                              II. ANALYSIS

¶ 36                            A. Motion to Suppress

¶ 37    We first address defendant's contention that the trial court erred in denying his amended motion to suppress statements. He asserts that he was incapable and unable to appreciate and understand or comprehend the *Miranda* rights that were read to him while in custody. Specifically, he maintains that he could not understand the rights he was forsaking, given that he was not experienced with the criminal justice system, had been in the United States for less than six months, spoke only Spanish, and did not and could not read the English consent form to search his phone.

¶ 38    In determining whether a trial court has properly ruled on a motion to suppress, the trial court's factual findings and credibility determinations will be reversed only if they are against the manifest weight of the evidence; however, this court will review *de novo* a legal challenge to the trial court's ruling. *People v. Harris*, 2012 IL App (1st) 100678, ¶ 45. Where a defendant challenges the admissibility of his confession through a motion to suppress, the State has the burden of proving that the confession was voluntary. 725 ILCS 5/114-11(d) (West 2018). The concept of voluntariness includes proof that the defendant made a knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel. *People v. Braggs*, 209 Ill. 2d 492, 505 (2003).

¶ 39    The test for a statement's voluntariness is a multifactor examination. *People v. Hughes*, 2015 IL 117242, ¶ 31. A court weighing the voluntariness of a confession should consider the totality of the circumstances, including the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning,

along with the legality and duration of the detention, the duration of the questioning, and any physical or mental abuse by police, including the existence of threats or promises. *Id.*

¶ 40   The evidence here establishes that defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. Before defendant was informed of his rights, Ulloa told defendant to let Ulloa know if he did not understand something. Ulloa read to defendant the *Miranda* warnings, which were written in Spanish, his native language. Defendant responded to Ulloa in Spanish that he understood the warnings. During the entire interview, defendant did not request any further explanation. Defendant also conceded that the videotape of the interview accurately depicted his conversation with Ulloa. Although he was not asked to sign the *Miranda* waiver form, his signature was unnecessary because defendant clearly and unequivocally told Ulloa that he understood his rights, while nodding his head. See *Miranda*, 384 U.S. at 475 (holding that "[a]n express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver"); *People v. Williams*, 124 Ill. App. 3d 734, 738 (1984) ("defendant's conduct in nodding his head constituted an expression of his understanding of his *Miranda* rights and his following statement to police constituted a valid waiver of those rights").

¶ 41   Defendant testified at the hearing that he did not understand the meaning of the words Ulloa was using and that he told Ulloa that he understood only because in the car Ulloa had told him to cooperate. The trial court found that Ulloa was credible and defendant was not. The court found that defendant's behavior, appearance, and engagement with Ulloa demonstrated that he understood that he was waiving his rights. The court also found that, although defendant might have lacked knowledge of the law concerning the alleged acts, that was inconsequential to his statement.

¶ 42   The record supports the trial court's findings. Defendant was 24 years old at the time of the questioning, he could read and write in Spanish, he had attended college for two years, and he told Ulloa that he understood the warnings. "[I]ntelligent knowledge" in the context of *Miranda* "means the ability to understand the very words used in the warnings." *People v. Bernasco*, 138 Ill. 2d 349, 363 (1990). It does not "mean the ability to understand far-reaching legal and strategic effects of waiving one's rights, or to appreciate how widely or deeply an interrogation may probe, or to withstand the influence of stress or fancy." *Id.* The trial court's credibility determinations and its finding that defendant knowingly waived his *Miranda* rights are not against the manifest weight of the evidence.

¶ 43                                B. Sufficiency of the Evidence

¶ 44   We next address the sufficiency of the evidence supporting defendant's convictions of predatory criminal sexual assault of a child. Defendant was charged with five counts and the trial court found him guilty of three counts but not guilty of the remaining two counts. Each count alleged that the sexual assault occurred on a separate occasion, between April 1, 2014, and July 20, 2014.

¶ 45   In reviewing the sufficiency of the evidence, the question is whether the evidence presented at trial, when viewed in the light most favorable to the prosecution, enables any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). A guilty verdict may be supported by not only the evidence itself but also any reasonable inference that may be drawn from the evidence. *Cunningham*, 212 Ill. 2d at 279-80. The

reviewing court should not substitute its judgment for that of the trier of fact on questions of credibility and the weight to be afforded to the evidence. *People v. Sutherland*, 155 Ill. 2d 1, 17 (1992). At the same time, the reviewing court has a duty to evaluate for itself the reasonableness of a guilty verdict. *Cunningham*, 212 Ill. 2d at 280.

¶ 46  To obtain a conviction of predatory criminal sexual assault of a child, the State had to establish beyond a reasonable doubt that defendant was 17 years of age or over when he knowingly placed his penis on the sex organ of J.M., who was under 13 years of age when the acts were committed. 720 ILCS 5/11-1.40(a)(1) (West 2014).

¶ 47  Defendant concedes that there is evidence of one count of sexual assault, occurring on July 20, 2014. He argues that the State failed to provide any specific evidence as to the two other counts. We disagree.

¶ 48  In addition to the evidence of defendant's confession that he had sexual intercourse with J.M. three times, J.M.'s trial testimony provided specific details regarding other instances of sexual intercourse. J.M. stated that she had sexual intercourse with defendant about four or five other times. J.M. recalled that the first incident occurred on a bed in the living room. Another incident took place on her bed, in the bedroom. Another occurred on her mother's bed. During this incident, defendant placed his penis in J.M.'s mouth and vagina. With J.M.'s testimony, the trial court reasonably could have used defendant's confession as conclusive evidence of at least three separate acts of sexual penetration.

¶ 49  Defendant points out various inconsistencies in J.M.'s testimony, which he claims cast doubt on her allegations. Defendant notes J.M.'s statement to her mother that "it was two times" and her mother's statement that she told the police officers, the social worker, and the hospital nurses that "the conduct occurred two times."

¶ 50  These are issues of credibility that intrude upon the province of the trier of fact that heard and considered the evidence. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). It likewise was for the trier of fact to resolve the discrepancies that appeared during the trial. The trier of fact has the responsibility to assess the credibility of the witnesses, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences therefrom. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). We will not substitute our judgment for that of the trier of fact on issues of the credibility of witnesses or the weight afforded the evidence. *People v. Jasoni*, 2012 IL App (2d) 110217, ¶ 19. We will not usurp what in this case was entirely within the province of the trial court, the trier of fact.

¶ 51  In sum, defendant admitted that he engaged in sexual intercourse with J.M. on three separate occasions. In addition to the July 20, 2014, incident, J.M. testified to at least two other separate acts of sexual penetration. During each incident, which took place in the same apartment, defendant would insert his penis inside J.M.'s vagina while using a condom that was discarded by flushing it down the toilet. After reviewing the entire record in the light most favorable to the prosecution, we conclude that there was sufficient evidence for a rational trier of fact to find that the State met its burden of proving that defendant committed three separate acts of sexual penetration, between April 1, 2014, and July 20, 2014.

¶ 52                                              C. Allocution

¶ 53  We last address defendant's contention regarding his right against self-incrimination. Defendant claims that his rights were infringed when the trial court relied on defendant's lack

of remorse in sentencing him. Although sentencing is normally within the trial court's discretion, whether the court relied on an improper aggravating factor is a question of law, which we review *de novo*. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8.

¶ 54    Defendant concedes that he failed to preserve the issue for review because he failed to raise it at the sentencing hearing and in his postsentencing motion. Defendant requests that we review the issue under the plain error doctrine. A reviewing court may exercise discretion and excuse a defendant's procedural default in two instances when it is appropriate to do so: (1) when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). "Reliance on an improper sentencing factor is amenable to plain-error review because such reliance 'impinges upon defendant's fundamental right to liberty.' " *People v. Maggio*, 2017 IL App (4th) 150287, ¶ 50 (quoting *People v. Kopczick*, 312 Ill. App. 3d 843, 852 (2000)).

¶ 55    Before the sentencing, the trial court asked the parties if they had reviewed the presentence investigation report (PSI) and if they had any "additions, corrections, [or] modifications." Defendant's counsel stated that the only correction needed was one change of the word "Mexico" to "Honduras." The trial court asked if defendant had any evidence in mitigation, to which counsel responded, "No, Your Honor, nothing beyond the presentence investigation." The trial court then asked if defendant wished to exercise his right to allocution. Counsel responded that he did not. In the PSI, defendant provided a statement to a probation officer, in which he stated: "I didn't do anything—I am here only because I speak. That's why I am sad. That's why I went to trial. I did not have sex with [L.M.'s] daughter."

¶ 56    Following arguments, the trial court sentenced defendant to an aggregate sentence of 27 years' imprisonment. In sentencing defendant, the judge stated:

"I considered the presentence investigation report, considered the contents therein, considered the facts and circumstances in this case, considered the factors in aggravation. I must find that the defendant's conduct caused serious harm to the victim. I can't imagine that someone undergoing this experience at the age of 11 will not have consequences for the rest of their lives.

* * *

As I indicated, I will find that the defendant does not have a significant history of delinquency or criminal activity, not to say *** that he lived a law-abiding life so far, however, not significant enough to alter the sentence that I am about to impose or follow the State's recommendation.

I find [it] a little bit disturbing that the defendant has not offered any allocution whatsoever and even changed the story when [it] came to statements [that defendant] made to the probation officer which [vary] significant[ly] from the video confession that this defendant has given."

¶ 57    During the denial of defendant's motion to reconsider the sentence, the trial judge stated: "And I also considered heavily the defendant's lack of remorse and the defendant's now recent denial."

¶ 58     "The normal rule in a criminal case is that no negative inference from the defendant's failure to testify is permitted." *Mitchell v. United States*, 526 U.S. 314, 327-28 (1999). In the sentencing context, the supreme court of Montana stated:

> "To allow sentencing courts to [use a defendant's silence as evidence of lack of remorse] would force upon the defendant the Hobson's choice *** which is condemned by the Fifth Amendment *** —specifically, that the defendant must either incriminate himself at the sentencing hearing and show remorse (with respect to a crime he claims he did not commit) or, in the alternative, stand on his right to remain silent and suffer the imposition of a greater sentence. To compel that of a defendant is constitutionally impermissible." *State v. Shreves*, 2002 MT 333, ¶ 23, 60 P.3d 991.

¶ 59     To be clear, a sentencing court may infer lack of remorse from any admissible statement made by the defendant, the manner of commission of the offense, or any other competent evidence adduced at trial or at the sentencing hearing. See, *e.g.*, *People v. Burgess*, 176 Ill. 2d 289, 317 (1997). However, the court may not draw a negative inference from the defendant's exercise of his constitutional right to remain silent. For instance, in *Maggio*, 2017 IL App (4th) 150287, ¶ 48, following the defendant's conviction of murder, the defendant refused to cooperate with the presentence investigation. The trial court stated at sentencing that the defendant's silence indicated his lack of rehabilitative potential. The *Maggio* court held that the trial court's comments were improper and necessitated resentencing, explaining that the defendant had the right to remain silent during the presentence investigation, and invocation of the right cannot be used as an aggravating factor at sentencing. *Id.* ¶ 49. When the trial court relies on an improper aggravating factor, resentencing is required unless it can be determined from the record that the weight placed on the improper factor was so insignificant that it did not lead to a greater sentence. *People v. Voit*, 355 Ill. App. 3d 1015, 1028 (2004).

¶ 60     The State argues that the trial court's consideration of defendant's silence did not lead to a greater sentence, because the trial court properly relied on defendant's comments in the PSI as indicating a lack of remorse and as one factor in fashioning defendant's sentence. The State maintains that, although the trial court "briefly referenced" that defendant offered no allocution, "a review of the complete record indicates that the court did not rely on that information, and that the sentences were based on proper sentencing factors."

¶ 61     The State cites *People v. Coleman*, 135 Ill. App. 3d 186, 189 (1985), wherein the Third District Appellate Court found that the trial court did not err in considering the defendant's lack of remorse. The court noted that the trial court did not seek an admission of guilt with the implied promise of a reduced sentence; rather, it considered the defendant's lack of remorse in conjunction with his potential for rehabilitation. *Coleman* is not on point. The court in that case did not conduct any analysis on the violation of the defendant's right against self-incrimination.

¶ 62     Clearly, the trial court can rely on defendant's lack of remorse, as in *Coleman*, but it must base its findings on competent evidence. See, *e.g.*, *Burgess*, 176 Ill. 2d at 317 (lack of remorse could be inferred from the defendant's reference to the murder victim as " 'the kid that died' "); *People v. Ward*, 113 Ill. 2d 516, 530-31 (1986) (a court may consider a lack of remorse in sentencing but may not rely on the defendant's exercise of his right against self-incrimination and must rely on other sources). Defendant's invocation of his right to not allocate is not such a basis. A court may not draw a negative inference from a defendant's exercise of his constitutional right to assert his innocence, as the trial court did in this case.

¶ 63      The trial court was free to contrast defendant's denial in the PSI of wrongdoing with his confession to the police; the problem is that the court explicitly relied on defendant offering no allocution, and we do not know how much weight was placed on the improper factor. See *Voit*, 355 Ill. App. 3d at 1028. As this involves defendant's fundamental right against self-incrimination and the court relied at least in part on an improper sentencing factor, which impinged upon his fundamental right to liberty, he has established plain error under the second prong. We therefore vacate defendant's sentence and remand for resentencing.

¶ 64      Defendant requests that we assign his case to a different judge on remand. Although we have the authority to assign a case to a different judge if circumstances call into question the original judge's impartiality, we do not find any such circumstances here. See *Eychaner v. Gross*, 202 Ill. 2d 228, 281 (2002); *People v. Buchanan*, 2013 IL App (2d) 120447, ¶ 26. Accordingly, we deny defendant's request.

¶ 65                            III. CONCLUSION

¶ 66      For the preceding reasons, we affirm the decision of the trial court in all respects, except that we vacate defendant's sentence and remand the cause for resentencing.

¶ 67      Affirmed in part and vacated in part.

¶ 68      Cause remanded with directions.