2024 IL App (1st) 211665-U

No. 1-21-1665

Second Division
March 12, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 19 CR 16790 |
| v. | ) | |
| | ) | |
| JESUS MELERO, | ) | Honorable |
| | ) | Ramon Ocasio III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's seven-year sentence for aggravated domestic battery is affirmed over his contention that the trial court abused its discretion in imposing the maximum sentence.

¶ 2    Following a bench trial, defendant-appellant Jesus Melero was found guilty of aggravated domestic battery and the trial court sentenced him to seven years' imprisonment. On appeal, defendant argues that the trial court abused its discretion in imposing a seven-year sentence of

imprisonment where the court based its decision on a personal belief or arbitrary reason and did not properly consider evidence in mitigation. For the reasons that follow, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4     On December 10, 2019, defendant was charged with one count of aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2018)), two counts of aggravated battery (720 ILCS 5/12-3.05), two counts of domestic battery (720 ILCS 5/12-3.2(a)(1)), one count of aggravated unlawful restraint (720 ILCS 5/10-3.1), and one count of unlawful restraint (720 ILCS 5/10-3(a)) following an incident occurring on November 6, 2019, where defendant allegedly punched, hit, and stabbed his wife. The case proceeded to a bench trial on May 6, 2021, at which the following evidence was presented.

¶ 5     The victim, Patricia Beltran, testified that she married defendant in July 2019 and they subsequently purchased a home together in Cicero, Illinois. According to Beltran, after they were married, Beltran noticed that defendant's behavior changed and he became paranoid and he accused Beltran of having an extramarital affair. Defendant also would take her cell phone, erase messages, and look through it. She testified that he had an application called Life360 that would track her location. On November 6, 2019, an argument between Beltran and defendant ensued when defendant picked up Beltran from work. After Beltran made dinner at home, defendant stated that he wanted a divorce and instructed Beltran to sign "a divorce document." She filled out the paperwork and defendant grabbed the document, stating that it was proof that she was having an affair because she was willing to get a divorce. Beltran testified that at that point she was "upset" and "scared" because defendant had "a look in his eye that was terrifying[.]" She stated to defendant that they needed a break from each other and she walked towards the front door. Defendant grabbed her hair and he "started hitting [her] and punching [her]" in the face. He then

dragged her into the bedroom, and when she turned around, defendant started swinging a large, serrated knife at her. She jumped on top of the bed and started yelling for help. Defendant kept swinging the knife at her and stabbing her with it until she was cornered against the wall. She testified that he "stabbed [her] on [her] legs, on [her] arm, [her] fingers, and then on [her] torso." She observed blood splattered everywhere. At some point, defendant began to calm down and she walked towards the bedroom door but he "slammed the knife on the floor in front of [her] feet" and threatened to cut off her toes if she left the room. Defendant then received a phone call from a coworker and afterwards "he snapped out of it" and began apologizing to Beltran. He helped her take a shower and change clothes. She testified that she was holding onto her left hand tightly because it was bleeding. She also had a large cut on her right arm. They laid in bed until 5 a.m. and defendant then helped her get ready and dropped her off at work. During this entire episode, defendant retained possession of Beltran's cell phone. He returned her cell phone to her when he dropped her off at work.

¶ 6     While she was at work, Beltran's fingers continued to bleed and she noticed that her fingers were turning purple. She called her sister-in-law, who picked her up from work around 3 p.m. and took her to Northwestern Immediate Care Center. Beltran testified that she turned her cell phone off when she left work with her sister-in-law, and she did not tell her sister-in-law how she sustained the injuries to her hand because she was "scared" and "was still processing." At the medical center, Beltran informed medical staff that she cut herself on a mirror. She testified that she said this because she was "scared to get [defendant] in trouble because [she] didn't want him to be mad at [her]." The doctor stated that the wound was too deep to treat there and she needed to go to the emergency room.

¶ 7    Her sister-in-law then picked up Beltran's sister, Toni, and dropped them both off at the police station at Blue Island Avenue and 15th Street where Beltran intended to file a police report and obtain an order of protection. The officers at Blue Island instructed her that she needed to go to the police station in Cicero to do that. At this time, Beltran did not inform the police as to why she needed an order of protection and her family members also were not aware.

¶ 8    Her sister-in-law retrieved them from the police station and drove to the emergency room at Northwestern. When Beltran first spoke with a nurse, she did not explain what caused the injuries because her sister was with her, and she had not yet told her sister or sister-in-law what happened. Beltran testified that she was embarrassed and ashamed of what happened. Eventually, after speaking with a security guard who intimated that her daughter had been a victim of domestic violence, Beltran decided to reveal what defendant had done and a social worker was called. Beltran received medical treatment, which included 20 stitches on her left hand and the wounds on her forearm and leg were cleaned.

¶ 9    Beltran was discharged from the hospital in the early hours of November 8, 2019. She went to her brother's house that morning and later to the police station, where she obtained an order of protection against defendant. In obtaining the order, she submitted an affidavit, attesting to the events that occurred on November 6. She further averred that, on September 19, 2019, defendant picked up Beltran from work and accused her of cheating on him. When they arrived home, they continued arguing and defendant punched her, threw items at her, and swung a pipe at her. He then proceeded to throw her down the stairs. She testified that, following the September incident, she went to Loyola Hospital for medical treatment and informed medical staff that she tripped and fell down the stairs. According to Beltran, she stated this, rather than that defendant injured her,

because he was with her in the treatment room at all times. After leaving the police station, she called defendant to inform him of the order and she stayed at her brother's house for a few days.

¶ 10   At this point, the State entered into evidence several photographs of Beltran, which were taken at the Cicero Police Department a few days after the incident. The photographs showed that Beltran had a black eye and wounds on her arm and leg. Photographs from Northwestern Hospital were also introduced, which showed the injuries to her left hand.

¶ 11   Beltran further testified that she later underwent surgery on her fingers as well as physical therapy to regain movement in her fingers. She testified that she has permanent scarring due to her injuries and she lost sensation on the top half of two fingers as a result of this incident.

¶ 12   Finally, the State entered a certified copy of defendant's 2014 misdemeanor domestic battery conviction.

¶ 13   The trial court found defendant guilty of all counts and subsequently merged all other counts into the aggravated domestic battery count. In so finding, the trial court stated that it believed Beltran to be a victim of emotional and mental abuse and that defendant "intentionally and knowingly caused great bodily harm to [Beltran] by cutting her with a knife to her arm, to her hand, to her leg."

¶ 14   On June 2, 2021, defendant filed a motion requesting that the court vacate its findings of guilt, or in the alternative, grant him a new trial. However, soon after that motion was filed, defendant "fired" private counsel, and the trial court later appointed a public defender to represent defendant. On November 16, 2021, defendant's appointed counsel filed an amended motion for a new trial. On December 22, 2021, the trial court denied the motion for a new trial.

¶ 15   Also on December 22, 2021, the court conducted the sentencing hearing. Defendant's presentence investigation (PSI) report was submitted to the court. In aggravation, the State

submitted Beltran's victim impact statement. Beltran's statement illustrated an environment of fear created by defendant, specifically stating that he was "possessive and angry" and that he installed cameras throughout their home so he could watch her. She further stated that she was still learning to use her left hand and she would never be the same emotionally and felt like she was "faking being alive." The State also submitted a statement from defendant's daughter, Alysa Melero. Therein, Alysa stated that defendant "brainwashed" her; defendant is "paranoid" and "lost"; defendant hurt everyone in her family; she was "locked inside the house for days at a time"; she is terrified of defendant; she heard Beltran's cries and she wished she could have protected Beltran from defendant; defendant called Beltran derogatory names and hit her; and defendant threatened to shoot or hit Beltran and herself constantly. Lastly, she stated that she did not "want him near any of us."

¶ 16    In mitigation, defense counsel argued that defendant has a high school education, two children, no felony arrests or convictions, and 21 years of reliable employment as a union painter. Defense counsel asked for the court to impose the minimum sentence. The court asked if defendant would like to make a statement in allocution. Inexplicably, defendant stated "I brought you a Christmas present." He then stated, "I just want it over with" and affirmed that he was declining the opportunity to speak on his own behalf.

¶ 17    In announcing sentence, the trial court stated: "I get the impression that you don't accept responsibilities for your actions. I think that the maximum sentence is probably not enough but that's all I can give you." After merging the other counts into aggravated domestic battery, the court sentenced defendant to seven years' imprisonment. Defendant filed a motion to consider his sentence, which the trial court denied.

¶ 18    This appeal followed.

¶ 19                                    II. ANALYSIS

¶ 20    On appeal, defendant argues that his seven-year sentence is excessive and the trial court abused its discretion in imposing the maximum sentence. He requests that this court reduce his sentence or remand for a new sentencing hearing.

¶ 21    The Illinois Constitution requires a trial court to impose a sentence that balances the seriousness of the offense and the defendant's rehabilitative potential. Ill. Const. 1970, art. I, § 11; *People v. Lee*, 379 Ill. App. 3d 533, 539 (2008). To achieve such balance, the trial court must consider both aggravating and mitigating factors including: "the nature and circumstances of the crime, the defendant's conduct in the commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education." *People v. Maldonado*, 240 Ill. App. 3d 470, 485-86 (1992). The trial court, as opposed to the reviewing court, is the best situated to assess these factors. *People v. Steppan*, 105 Ill. 2d 310, 323 (1985). Accordingly, the trial court has broad discretion to impose a sentence, and a sentence that is within statutory limits is reviewed for an abuse of that discretion. *People v. Contursi*, 2019 IL App (1st) 162894, ¶ 23. This court will not substitute its judgment for that of the trial court merely because we would have weighed the sentencing factors differently, and we will alter a sentence only when it varies greatly from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Id.* Under Illinois Supreme Court Rule 615(b)(4) (eff. Jan 1, 1967), reviewing courts have the power to reduce sentences; however, that power should be used "cautiously and sparingly." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 22    Here, defendant was found guilty of aggravated domestic battery, a Class 2 felony with a statutory sentencing range of 3 to 7 years' imprisonment. 730 ILCS 5/5-4.5-35(a) (West 2018).

Defendant's sentence was the statutory maximum sentence for this offense. Because the court's sentence falls within the statutory range, we must presume it is proper. See *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 49. Such a sentence will only be overturned upon "an affirmative showing that the sentence imposed greatly departs from the spirit and purpose of the law or is manifestly contrary to constitutional guidelines." *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). For the following reasons, we conclude that the trial court's imposition of the maximum sentence was not an abuse of discretion.

¶ 23    Our review of the record shows that the relevant facts of the case support a finding that the seven-year sentence is not greatly at variance with the spirit and purpose of the law or manifestly disproportionate. The evidence presented at the trial showed that, while in their home, defendant suddenly attacked Beltran, pulling her hair and punching her in the face, and he inflicted serious injuries to her by repeatedly cutting her with a knife while she was trapped in the corner of their bedroom. He further threatened her during this incident, stating that he would cut off her toes if she tried to leave. His actions were both violent and erratic. Moreover, Beltran's testimony depicted defendant as a highly possessive and paranoid individual who tracked Beltran's location and did not allow her any semblance of privacy. The evidence also showed that, in her affidavit in obtaining an order of protection, Beltran referenced a prior violent episode during which defendant swung a pipe at her and pushed her down a flight of stairs. Beltran's testimony and her victim impact statement demonstrated that she was extremely fearful of defendant, going so far as to avoid certain traffic routes and hospitals when seeking treatment for her injuries. Beltran's injuries, which included knife wounds to her torso, leg, forearm, and fingers, were not insignificant by any means. In addition to the stitches she received on her hand, she later required surgery and physical therapy to regain use of her fingers, and she has permanent scars from her wounds and has lost

feeling in her fingers. Taken together, the evidence showed a dangerous man who caused severe physical injuries and emotional damage to Beltran.

¶ 24    Additionally, defendant's daughter, Alysa, submitted a victim impact statement that matched Beltran's depiction of defendant. Her statement  also indicated that individuals other than Beltran have been caused harm by defendant and are at risk of further harm. Further, although defendant does not have an extensive criminal history, there is a prior misdemeanor conviction for domestic battery, indicating that this is not the first time defendant has been the perpetrator of domestic violence and his behavior has escalated. Based on this record, we cannot say that the trial court's imposition of the maximum sentence was an abuse of discretion.

¶ 25    Nonetheless, defendant contends that the trial court "seemingly imposed the maximum sentence upon [defendant] either for a personal belief or arbitrary reason." A defendant's sentence may be remanded for resentencing when a trial court fashions a sentence based on the court's personal beliefs or arbitrary reasons. *People v. Bolyard*, 61 Ill. 2d 583, 586-87 (1975). Here, in announcing sentence, the trial court stated: "I think that the maximum sentence is probably not enough but that's all I can give you." Defendant asserts that the court erroneously based its sentencing decision on the opinion that the maximum for aggravated domestic battery is too low. The State argues that the court's statement only stressed the seriousness of the offense and the court did not disregard the statutory sentencing limits. We agree with the State and reject defendant's argument for the following reasons.

¶ 26    We do not find that the court's limited statement can be construed as a personal belief in regards to these types of crime. In *Bolyard*, the supreme court found that the trial court had abused its discretion in sentencing the defendant because the court's sentence was based on a personal belief. 61 Ill. 2d at 587. However, there, the trial judge expressly opined that certain crimes,

regardless of the specific facts of the case, are not deserving of probation and arbitrarily denied consideration of probation for an eligible defendant. *Bolyard*, 61 Ill. 2d at 585-587. In this case, the trial court did not announce a definitive opinion on the sentencing range for aggravated domestic battery, and even if the court did believe the maximum sentence should be increased for that offense, the court did not ultimately sentence defendant outside the range. Thus, we do not find the court's sentencing decision was based on a personal belief or arbitrary reason.

¶ 27 Further, this court should not focus on a few words or statements of the trial court but consider the entire record as a whole. *People v. Ward*, 113 Ill. 2d 516, 526-27 (1986). Here, the statement that the maximum was too low was directly preceded by: "I get the impression that you don't accept responsibilities for your actions." This suggests that the court was, in fact, reflecting upon the specific facts and circumstances of defendant's case, and in particular, defendant's lack of remorse. Our supreme court has held that lack of remorse may be properly considered in determining a sentence, but a court may not rely on the defendant's exercise of his right against self-incrimination and must rely on other sources. *Ward*, 113 Ill. 2d at 529; *People v. Barrow*, 133 Ill. 2d 226, 281 (1989); see also *People v. Matute*, 2020 IL App (2d) 170786, ¶ 62 (A "[d]efendant's invocation of his right to not allocate" cannot serve as a basis for a finding of lack of remorse.). Notwithstanding defendant's refusal to make a statement in allocution, the record otherwise supports the court's finding that defendant did not accept responsibility and showed no remorse for his actions. At a previous appearance before the court, defendant asserted: "I wanted to show you, Judge, how my wife came here and lied to you in your courtroom. She spit on your floor. She lied to you, sir. And with all respect, she lied to the State's Attorney. She lied to the detectives, and everybody else." These statements indicate that defendant refused accountability for his actions, and, in fact, the accusatory nature of his statements lend credence to Beltran and

Alysa's victim impact statements. Because the trial court is best situated to assess a defendant's demeanor and credibility, we see no reason to reject the trial court's finding that defendant failed to take responsibility for his actions. See *Alexander*, 239 Ill. 2d at 213 (the trial court, having observed the defendant and the proceedings, is in the best position to consider the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age). Thus, the trial court properly considered defendant's lack of remorse in deciding that the maximum sentence was warranted. See *People v. Donlow*, 2020 IL App (4th) 170374, ¶ 84 ("[T]rial courts may consider a defendant's lack of remorse or lack of veracity in imposing a sentence, since those are factors which may have a bearing on the defendant's potential for rehabilitation." (Internal quotation marks omitted.)).

¶ 28    Lastly, defendant asserts that the record shows ample mitigating evidence that demonstrates his rehabilitative potential, specifically his consistent employment history as a union painter for 21 years and his lack of prior felony convictions. Further, in his reply brief, he contends that "[t]he only way to definitively know whether the court properly considered the appropriate factors in mitigation is where a court lists the specific factors it considered when fashioning a sentence, which the court in this case failed to do." However, the court is not required to recite each factor considered or the weight given to the evidence presented. *People v. Garibay*, 366 Ill. App. 3d 1103, 1109 (2006). Moreover, absent some affirmative indication to the contrary, the trial court is presumed to have properly considered all relevant factors and any evidence in mitigation or aggravation. *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48. In the instant case, defendant has not made such a showing. Defendant's criminal history and employment history were presented to the court by defense counsel at the hearing and in defendant's PSI, of which the court acknowledged receipt. There is nothing in the record that affirmatively shows that the court

ignored defendant's evidence in mitigation. Moreover, the trial court is "presumed to know the law and apply it properly." *People v. Smith*, 176 Ill. 2d 217, 260 (1997). Because there is no express indication in the record that the court disregarded factors in mitigation, defendant's argument that the mitigating evidence was not considered is meritless. To the extent that defendant implores this court to reweigh the evidence in mitigation and arrive at a lesser sentence, we reject his request. See *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46 (the reviewing court will not reweigh evidence the trial court relied upon in sentencing the defendant). The trial court has broad discretionary powers in its sentencing decision, and we will not substitute our judgment for that of the trial court. See *Alexander*, 239 Ill. 2d at 212-13.

¶ 29    In any case, the presence of a mitigating factor does not automatically entitle the defendant to the statutory minimum sentence. *People v. Sharp*, 2015 IL App (1st) 130438 ¶ 133. In fact, the seriousness of the offense is the most significant factor in determining a sentence (*People v. Busse*, 2016 IL App (1st) 142941, ¶ 28), and as we have explained, the evidence presented showed that defendant inflicted serious physical injuries upon Beltran, which left permanent scars, and caused her emotional trauma. It would not be unreasonable to find that the seriousness of the offense outweighed defendant's solid employment history and lack of felony convictions. Thus, defendant's argument that the trial court did not properly consider mitigating evidence is without merit.

¶ 30    Accordingly, we conclude that the trial court did not abuse its discretion in sentencing defendant to seven years' imprisonment.

¶ 31                                    III. CONCLUSION

¶ 32    For the reasons stated, we affirm the judgment of the circuit court.

¶ 33    Affirmed.